## UNITED STATES v. MINNECI et al.
### No. 321.

Circuit Court of Appeals, Second Circuit.

April 24, 1944.

See, also, 53 F.Supp. 911.

Emery S. Tucker and Frank G. Raichle, both of Buffalo, N. Y., for Stein.

Michael D. Lombardo, of Jamestown, N. Y. (Clarence G. Pickard, of Jamestown, N. Y., of counsel), for Minneci.

Robert M. Hitchcock, of Washington, D. C., and George L. Grobe, U. S. Atty., of Buffalo, N. Y., for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Stein and Minneci appeal from a judgment convicting them of receiving, concealing, and facilitating the transportation of, gold bullion, which they knew to have been brought into the United States contrary to law. § 1593(b), 19 U.S.C.A. The only question raised is of the sufficiency of the evidence; and the facts, as the jury might have found them, were as follows. Stein was tracked by governmental agents from Detroit to Buffalo, where he at once went to a hotel. He carried a bag which he checked at the hotel, and made a telephone call during which he was heard to make an appointment to meet his interlocutor in the dining room. He went to the dining room and Minneci joined him there; they left the hotel together, walked a few blocks to a motor car which they entered and in which they drove back to the hotel. Stein went in, got his bag, and together they then drove to a railway station, where they got out, took the bag out of the rear of the car, and put into it a brown paper package which Minneci had with him. After they had walked with the bag a short distance from the car, they apparently changed their minds, returned to the car and drove to an airport, where Stein checked the bag. They were then arrested, and Stein tried to rid himself of the check without being detected.

In the brown paper package were found four "buttons" of gold, weighing about 280 ounces Troy—23⅓ pounds. Inside the outer wrapping, but outside a cardboard box, which contained the gold, were newspapers of Hamilton, Ontario. Inside the box were similar newspapers and a "drycleaner's jacket," labelled "Britannia Cleaners of Hamilton, Ontario." Taped upon the outside of the box was a typed sheet of paper, being an assay of four "buttons" of gold. Each of the "buttons" had been drilled for samples, and the holes had been covered with tape. A Canadian gold assayer, named Heys, testified that a man named Rose had brought him four "buttons" of gold, like those found in the package, and that he had drilled them for test specimens and had assayed the drillings. He then returned the "buttons" to Rose with the original of his assay, of which he produced a copy in court. The assay pasted upon the cardboard box was the original given to Rose. A government assayer took drillings from the "buttons" found in the box, and assayed them, but his assay did not correspond with that of Heys within the margin of tolerance recognized among assayers. Heys assayed two of his drillings a second time, and one a third time; but the variances remained between him and the government assayer, and his various assays did not match with each

other. The prosecution proved that neither Stein nor Minneci had licenses to import gold; it did not prove that no license had ever been issued to Rose.

From what we have said it is plain that both of the accused had "received" the four "buttons" of gold, and were surreptitiously engaged in "transporting" them. All that remained to be proved was that the metal had been imported into the United States contrary to law, and that the accused knew that it had been. However, it the prosecution proved that the "buttons" had been unlawfully imported, it was not necessary to prove guilty knowledge, because the accused did not take the stand to "explain the possession to the satisfaction of the jury." § 1593 (c), 19 U.S.C.A. Thus, although the prosecution was obliged to prove the unlawful importation (Sherman v. United States, 5 Cir., 268 F. 516; Kennedy v. United States, 9 Cir., 44 F.2d 131, 133), that was the measure of its burden.

That issue was in two parts: that the gold had been imported; that it had been imported without any license. The evidence is clear that the "buttons" were imported. We know that the assay which Heys gave to Rose in some way made its way from Canada to the United States. We also know that it was pasted upon a box stuffed with rubbish in Hamilton. The chance that all the papers and the "dry-cleaner's" jacket should have found their way to the United States and been used without any local stuffing is too remote for serious consideration. Moreover, it is incredible that the box so stuffed and so armed with the assay in Hamilton should not have contained the gold "buttons" which Rose received from Heys. If these were not the "buttons" found in the box when it was seized, somebody had substituted other "buttons". (Incidentally even that would be irrelevant unless this had been done in the United States.) The possibility that anyone did make such a substitution may also be excluded; the only imaginable motive would be to substitute a baser quality of gold, and if the government assay and Heys's assay are both correct, the putatively new "buttons" were of finer quality. There was therefore practically no rational possibility that Rose's "buttons" were not the "buttons" seized. Whatever plausibility the argument has, depends upon the assumption that Heys's

assay was right. There is no reason to assume anything of the kind. His drillings may have been contaminated, the gold may have varied in the different drillings; he may not have been a reliable assayer. (As we have said, his own assays of the same drillings varied more than the allowed tolerance.) There can therefore be no question that the "buttons" seized were Rose's.

If the "buttons" were imported, the importation was surely unlawful. They were worth over $8,000; their volume was not over seven cubic inches; they were put in a cardboard box six times too large, stuffed with rubbish. Although, as we have shown, the box was packed in Hamilton, we are asked to suppose that it was packed by a man who had a license and was engaged in a legitimate enterprise. The importation of gold is hedged about with the straitest restrictions, and strictly scrutinized. It is unimaginable that anyone, meaning to import the metal lawfully, should have fitted it out in such preposterous trappings as those before us; the only thing about the appeals which we can commend is the hardihood in supposing that they could possibly succeed.

Judgment affirmed.